IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WILLIAM E. TYLER<br>*Defendant*. | Criminal No.: ELH-19-054 |

**MEMORANDUM OPINION**

Defendant William Tyler is serving a sentence of one year and one day of imprisonment for unlawful transfer and possession of machine guns. Although that sentence was imposed on January 28, 2020 (ECF 28, ECF 29), defendant's self-surrender date was postponed several times, due to the COVID-19 pandemic. *See* ECF 36, ECF 48, ECF 52; *but see* ECF 55. Therefore, Tyler did not begin to serve his sentence until November 11, 2020. ECF 52.

Through counsel, Tyler has filed a motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). ECF 56 (the "Motion"). He asks the Court to reduce his sentence to time served, for medical reasons. The government opposes the Motion. ECF 58. Defendant has replied. ECF 59.

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall deny the Motion.

**I. Background**

On February 4, 2019, the United States Attorney for the District of Maryland issued an Information charging defendant, a former police chief, with the knowing possession and transfer

of two machine guns, in violation of 18 U.S.C. § 922(o). ECF 1.[1] Tyler entered a plea of guilty on February 12, 2019 (ECF 6), pursuant to a Plea Agreement. ECF 8. The offense carries a maximum term of imprisonment of ten years. *Id.* at 2.

The parties contemplated a final offense level of 12. ECF 8 at 4, ¶ 6(a). And, the government agreed to recommend "a reasonable sentence" in light of the factors in 18 U.S.C. § 3553(a). *Id.* at 5, ¶ 9.

The Plea Agreement included a stipulation of facts. *Id.* at 9. The stipulation reflects that during the relevant period, Tyler was the Chief of Police of the Taneytown Police Department ("TPD"), a small police department in Carroll County, Maryland. *Id.*; *see* ECF 23 (government's Sentencing Memorandum) at 1. The TPD "maintained machine guns in its armory for official use," including "two Ruger .223 caliber, model KAC556 machine guns . . . ." ECF 8 at 9. One had the serial number 19201541 ("Machine Gun No. 1"), and the other had the serial number 19201542 ("Machine Gun No. 2"). *Id.* Both machine guns "were registered to the TPD and were restricted to Government entities or export in the National Firearms Registration and Transfer Record, which is the central registry of all restricted weapons." *Id.* Moreover, the parties stipulated that the weapons qualified as machine guns under the National Firearms Act. *Id.*

On November 8, 2017, Tyler "transferred" Machine Gun No. 1 "from the TPD to himself." *Id.* Defendant stipulated that he did so "purposely and voluntarily, and not by accident or mistake," and that "he did not possess or transfer the machinegun in an official capacity as a law enforcement officer." *Id.* Further, on November 13, 2017, he "caused the transfer" of Machine Gun No. 2 "to

---

[1] On February 12, 2019, defendant waived his right to prosecution by Indictment and consented to prosecution by Information. ECF 7. Although the Information employs the spelling "machinegun," ECF 1, I shall use the spelling "machine gun," as it is consistent with the parties' usage in regard to the Motion. *See, e.g.*, ECF 56 at 2; ECF 58 at 1.

Officer 1 for Officer 1's personal use and possession." *Id.*  Defendant did not report the transfers to the relevant authorities. *Id.*

Law enforcement executed a search warrant on January 15, 2019, at the residences of Tyler and Officer 1, respectively. *Id.*  Machine Gun No. 1 was recovered from Tyler's residence, and Machine Gun No. 2 was recovered from the residence of Officer 1. *Id.*

Further, the stipulation states, *id.*:

> On January 15, 2019, the Defendant was interviewed by the FBI and was warned that it is a crime to make a materially false statement or representation to the FBI. Thereafter, the Defendant lied when he told agents of the FBI that he had never fired the Ruger .223 machinegun bearing serial number 19201541 and did not know it was automatic, when in truth and fact, the Defendant had previously fired the machinegun and knew it was automatic.

As noted, sentencing was held on January 28, 2020. ECF 28. Tyler, who was born in 1963, was fifty-six years of age at the time. ECF 12 (Presentence Report, "PSR") at 2. With respect to defendant's health, the PSR reflected that he stood five feet and nine inches tall and weighed approximately 240 pounds. *Id.* ¶ 43. In addition, the PSR indicated that Tyler suffers from hypertension. *Id.* ¶ 44.

The PSR reflected a final offense level of 15. *Id.* ¶ 24. This differed from the final offense level of 12 that was contemplated in the Plea Agreement. *See* ECF 8, ¶ 6(a). Defendant has no prior criminal record. Thus, the PSR reflected a criminal history category of I. *Id.* ¶ 27. Tyler's advisory sentencing Guidelines called for a sentence of imprisonment ranging from eighteen months to twenty-four months. *Id.* ¶ 55. However, if defendant had a final offense level of 12, as the parties had anticipated, his Guidelines would have called for a sentence ranging from ten to sixteen months of imprisonment.

At sentencing on January 28, 2020, the government recommended a sentence consistent with the Guidelines contemplated by the parties in the Plea Agreement. *See* ECF 23 at 1 n.1. In

particular, the government recommended a sentence of imprisonment of one year and one day. *Id.* at 4.

The Court imposed a sentence of twelve months and one day of incarceration, followed by three years of supervised release. ECF 29. And, the Court ordered Tyler to surrender to the Bureau of Prisons ("BOP") by April 29, 2020. *Id.*

Thereafter, Tyler sought three separate extensions of his self-surrender date, due to the global COVID-19 pandemic. ECF 35; ECF 40; ECF 51. The Court granted those requests. ECF 36; ECF 48; ECF 52. And, by Order of August 7, 2020 (ECF 52), the Court extended the self-surrender deadline to November 11, 2020.

On October 14, 2020, Tyler moved for a fourth extension, until "after November 11, 2020." ECF 53. The government opposed that motion. ECF 54. By Order of November 2, 2020 (ECF 55), the Court denied the fourth extension motion.

Tyler surrendered as ordered, and began serving his sentence on November 11, 2020. ECF 56 at 3; ECF 58 at 2. Defendant is currently serving his sentence at FCI Beckley in West Virginia. ECF 56 at 6; ECF 58 at 4; *see also Find an inmate*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Apr. 5, 2021). He has a projected release date of September 17, 2021. ECF 56 at 1; *see Find an inmate*. And, the BOP could release him to a halfway house or home detention in advance of that date.

At this point, defendant has served about forty-two percent of his sentence. And, accounting for good time credit, he has served approximately fifty percent of his sentence.

Tyler asserts that he submitted a request for compassionate release to the Warden on December 21, 2020, but he has not received a response. ECF 56 at 3. Although defendant does not provide any documentation of the submission to the Warden, the government does not oppose

-4-

the Motion on grounds of exhaustion. The government states: "The Government assumes that defense counsel, as an officer of the court, has confirmed that the Defendant actually made this request. If he did, he has exhausted administrative remedies since more than 30 days has elapsed since December 21, 2020." ECF 58 at 4.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. Section 3582 was adopted as part of the Sentencing Reform Act of 1984. It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice)

(observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA"). *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the

Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release. *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)   **Medical Condition of the Defendant**.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-

stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence. Application Note 1(C) concerns Family Circumstances. Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement. Rather, the Court must consider the Sentencing Commission's policy statements. *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under §

-8-

3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"). However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act. Thus, it is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). In other words, "[b]y its plain terms…§ 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at \*7; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at \*3 (W.D. Va. Apr. 2, 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.

*Dillon*, 560 U.S. at 826-27; *see also United States v. Kibble*, __F.3d__, 2021 WL 1216543, at *3 (4th Cir. Apr. 1, 2021) (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A), but district court enjoys broad discretion in conducting the analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). But, compassionate release is a "rare" remedy. *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III. COVID-19[2]

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[3] The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).

---

[2] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[3] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, 818 Fed. App'x 393 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis.

The virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. Many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted). As of April 5, 2021, COVID-19 has infected more than 30.8 million Americans and caused over 555,000 deaths in this country. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Apr. 5, 2021).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus*

*Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, July 17, 2020, and November 2, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. On March 29, 2021, to reflect the most recently available data, the CDC again revised its guidance. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 29, 2021), https://bit.ly/38S4NfY. According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; and substance use disorders. *Id.* The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

Unfortunately, there is currently no cure for the virus. To stem the spread of the virus, people have been urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020)

(Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id*.; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoner usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from

approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the Bureau of Prisons ("BOP") implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the BOP from COVID-19. The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend

the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On a positive note, the country has recently seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson). The vaccines were initially made available to health care workers, the elderly in nursing homes, and first responders. But, the criteria for eligibility has since expanded considerably, and the vaccine is now available to all persons 16 years of age and older. However, challenges remain in securing a vaccination.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of April 5, 2021, the BOP had 126,111 federal inmates and 36,000 staff. And, by that date, the BOP had administered 122,935 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 5, 2021).

Nevertheless, as with the country as a whole, the virus persists in penal institutions.[4]  As of April 4, 2021,  BOP reported that 376 inmates out of a total of 126,196 inmates, and 1,270 BOP staff out of some 36,000 staff members, currently test positive for COVID-19; 46,881 inmates and 5,485 staff have recovered from the virus; and 228 inmates and four staff members have died from the virus.  Moreover, the BOP has completed 108,438 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 4, 2021).  *See COVID-19*, Fed. Bureau of Prisons, https://bit.ly/2XeiYH1.

With respect to FCI Beckley, where the defendant is a prisoner, the BOP reported that as of April 5, 2021, one inmate and six staff tested positive for COVID-19 and 221 inmates and 80 staff have recovered at the facility. And, 175 staff and 683 inmates have been inoculated with the vaccine.  *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 5, 2021).

### IV. Discussion

#### A. Extraordinary and Compelling Reasons

Tyler has moved for compassionate release on the ground that his health conditions and his age render him particularly vulnerable to COVID-19.  *See* ECF 56 at 4.  In particular, defendant

---

[4] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2. More recently, on October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.  *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020),  https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems." *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

asserts that he is obese and has hypertension, among other health conditions. *Id.* And, defendant is now fifty-seven years of age. The government counters that defendant fails to identify any particular health conditions that would increase his risk of severe illness after contracting COVID-19. ECF 58 at 18.

Defendant has failed to provide any documentation of obesity or hypertension. Nevertheless, it is easily inferable from the PSR that, at least as of April 2019, defendant was obese. At a height of five feet, nine inches tall, and a weight of 240 pounds, defendant's BMI was 35.4. *See Calculate Your Body Mass Index*, National Heart, Lung, and Blood Institute, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last accessed Apr. 5, 2021). According to the CDC, a BMI of 25 or higher is a risk factor for severe illness due to COVID-19. *See People of Any Age with Underlying Medical Conditions*, https://bit.ly/38S4NfY; *see also* Emily Anthes, *Severe Obesity Raises Risk of Covid-19 Hospitalization and Death, Study Finds*, N.Y. TIMES (Mar. 8, 2021) ("A large new study has confirmed an association between obesity and patient outcomes among people who contract the coronavirus.").

As for hypertension, courts have found that condition to be a compelling reason for compassionate release. *See, e.g., United States v. Salvagno,* No. 5:02-cr-00051-LEK, 2020 WL 3410601 (N.D.N.Y June 22, 2020) (granting compassionate release to inmate whose sole medical condition was hypertension); *United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13, 2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension constituted extraordinary and compelling reason); *United States v. Patterson*, TJS-20-1078, 2020 WL 2217262, at *3 (D. Md. May 7, 2020) ("There is ample evidence that people with hypertension are more likely to experience complications if they become infected with COVID-19"); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (defendant's diabetes, hypertension,

obesity, and age constituted extraordinary and compelling reason); *United States v. Pena*, No. 15-CR-551 (AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) ("This Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals with hypertension[.]"); *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to defendant with hypertension, prediabetes, prostate issues, bladder issues, and a dental infection).

However, the PSR reflects only that the defendant reported having hypertension; it does not address the severity of the condition or indicate whether defendant requires medication for it. Nor has defendant provided any evidence of his condition.

Nevertheless, on the basis of the defendant's obesity, I am satisfied that Tyler satisfies the "extraordinary and compelling" prong of the § 3582 analysis. However, that does not end the inquiry.

### B. Sections 3142(g) and 3553(a)

Relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). To determine whether a defendant is a danger to the community, the Court must consider the factors under 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community.

The Court must also consider the factors set forth in 18 U.S.C. § 3553(a), as required by 18 U.S.C. § 3582(c)(1)(A). These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the

applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

Tyler acknowledges the seriousness his offense. ECF 56 at 6. But, he points out that although the offense involved a weapon, "it involved no allegations of violence or any type of harm to an individual or property." *Id.* at 7. As to the question whether he poses a danger to the community, defendant asserts: "[C]ontinued incarceration is not necessary to protect the community from the crimes of the defendant. He has lived peacefully and productively in his community before, during and after his arrest and sentencing, and pre-surrender period." *Id.* In addition, Tyler asserts that "it is easy to understand that in prison he lives with a more heightened sense of danger than a non-law enforcement officer does in the same situation." ECF 59 at 9. But, he does not elaborate on that contention or offer any supporting detail.

The government highlights that Tyler "was the top law enforcement official in Taneytown," and that "[n]o officer is above the law or above punishment by virtue of his position or rank." ECF 58 at 21. According to the government, defendant's offense "undermines the public's trust in the many good and honest law enforcement officers that serve us faithfully and put their lives on the line day after day," especially because defendant lied to federal investigators. *Id.* at 22. Moreover, defendant "corrupted another police officer by persuading him to likewise break the law." *Id.* at 21. And, the government contends that reducing Tyler's sentence to time served would create an unwarranted sentencing disparity "with other officers in similar circumstances." ECF 58 at 22.

As I see it, the factors under § 3553(a) do not weigh in favor of reducing Tyler's sentence at this time. The seriousness of the underlying offense, coupled with the defendant's lenient sentence, are particularly relevant to the analysis. Tyler's sentence of one year and one day was

well below the Guidelines range, which called for a sentencing ranging from eighteen months to twenty-four months of incarceration. ECF 12, ¶ 55. Defendant has served about fifty percent of that lenient sentence, accounting for good time credit.

For the reasons advanced by the government, a sentence reduction at this juncture would be inconsistent with the sentencing goals of incapacitation and general deterrence. It would also be contrary to the principle of avoiding unwarranted sentencing disparities.

## V. Conclusion

For the foregoing reasons, the Court concludes that release under 18 U.S.C. § 3582(c)(1)(A) is not warranted at this time. Therefore, I shall deny the Motion, without prejudice.

An Order follows, consistent with this Memorandum Opinion.

Date:   April 12, 2021                                         /s/
                                                        Ellen Lipton Hollander
                                                        United States District Judge